# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHIRLEY LACKO,            )
)
        Plaintiff,       )      Case No. 17 C 2100
)
    v.               )
)      Judge Jorge L. Alonso
UNITED OF OMAHA LIFE    )
INSURANCE COMPANY,     )
)
        Defendant.    )

## MEMORANDUM OPINION AND ORDER

After defendant United of Omaha Life Insurance Company ("United of Omaha") denied her request for short and long-term disability benefits, plaintiff Shirley Lacko ("Lacko") filed a one-count complaint under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). The parties have filed cross motions for summary judgment. For the reasons set forth below, the Court grants defendant's motion [46] for summary judgment and denies plaintiff's motion [31] for summary judgment.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

---

[1] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Furthermore, the Court does not consider facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

Plaintiff began working for a predecessor of her employer, BKD, in approximately January 1999. While plaintiff was employed by BKD, it sponsored benefit plans offering short-term disability ("STD") payments and long-term disability ("LTD") payments. The STD plan covers the first 90 days of disability, after which the LTD plan applies. Defendant United of Omaha is the claims administrator for the STD and LTD plans.

The terms of the STD plan are different from the terms of the LTD plan. The STD plan provides:

> **Disability and disabled** mean that because of an Injury or Sickness, *a significant change* in Your mental or physical functional capacity has occurred in which:
>
> * * *
>
> (b) after [the first fourteen days], You are:
>
>> (1) prevented from performing the Material Duties of Your Regular Job (on a part-time or full-time basis) or are unable to work Full-Time; and
>>
>> (2) unable to generate Current Earnings which exceed 99% of Your Weekly Earnings due to that same Injury or Sickness.
>
> * * *
>
> **Material duties** means the essential tasks, functions, and operations relating to Your Regular Job that cannot be reasonably omitted or modified.
>
> **Regular Job** means the occupation You are routinely performing when Your Disability begins.

(Administrative Record at 1101-1103 (italicized emphasis added)).

The LTD plan, on the other hand, provides:

> **Disability and Disabled** means that because of an Injury or Sickness, *a significant change* in Your mental or physical functional capacity has occurred in which You are:
>
>> (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>>
>> (b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 3 years, Disability and Disabled mean You are unable to perform all of the Materal Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

\* \* \*

**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

\* \* \*

**Regular Occupation** means the occupation You are routinely performing when Your Disability begins. *Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT).* We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice. *To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer*, at a specific location, or in a specific area or region.

(LTD plan at 29-31/Docket [1-1 at 54-57] (italicized emphasis added)).

By September 2015, plaintiff (who was born in December 1953) was working full-time at BKD as a Senior Audit Manager for an annual salary of $93,250.04. The job description of Senior Audit Manager states that plaintiff was responsible for, among other things:

supervis[ing] Seniors, Associates, and Interns. He or she is responsible for audit program approval, personnel scheduling, audit working papers review, financial statement disclosure footnote approval, day to day client relationships, determination of billings for engagements, and evaluation of Interns, Associates and Seniors.

(Administrative Record at 959-961). In addition, a Senior Audit Manager was expected to manage "multiple concurrent engagements," demonstrate "proficiency/subject matter expertise with industry-specific technical standards," supervise and train other accountants, assign workload and develop new business. The job description noted that the position requires sitting

for up to four hours and working at a computer for up to four hours.  In addition, the position included driving a firm or personal vehicle approximately 25% of the time.  Plaintiff's employer described her job as sedentary.

<strong>Plaintiff's claim for short-term benefits[2]</strong>

On September 25, 2015, when she was 61 years old, plaintiff stopped working, complaining of chronic pain, cognitive dysfunction and anxiety.  She applied for benefits under the STD plan on October 2, 2015.  United of Omaha requested that plaintiff provide a statement from an attending physician.  Vanessa Hagan, M.D. ("Dr. Hagan"), plaintiff's physician, completed the form.  Dr. Hagan stated that the reason plaintiff could not work was "severe" back pain and abdominal pain.  Dr. Hagan expected the condition to last about six months.

On October 19, 2015, after speaking with plaintiff, United of Omaha approved plaintiff's claim for short-term disability benefits for the period of October 12, 2015 through October 27, 2015.  United of Omaha also requested additional medical records.  On October 27, 2015, United of Omaha approved short-term disability benefits for plaintiff through November 8, 2015 and requested additional medical information.

Plaintiff supplied additional records, including records from plaintiff's April and May 2015 visits to Dr. Hagan.  Those records reflected that plaintiff had reported feeling pretty good.  Plaintiff also provided records from a July 23, 2015 appointment with Dr. Hagan.  At that appointment, plaintiff had reported on-and-off back pain.  Plaintiff saw Dr. Hagan on September 24, 2015, at which point plaintiff reported pain all over.  Dr. Hagan referred plaintiff to a rheumatologist, Daniel Hirsen, M.D. ("Dr. Hirsen").

---

[2] Ordinarily, a chronological description of the facts is easiest to follow.  Here, though, the Court is reviewing decisions of a plan administrator, so it is important to understand what information the plan had at various points in time.

Plaintiff saw Dr. Hagan again on October 27, 2015. At that appointment, plaintiff reported "some back pain, on and off." On October 31, 2015, Dr. Hagan completed a physician statement, noting that plaintiff had back pain, osteoarthritis and diabetes. Dr. Hagan wrote that plaintiff was first treated in 2010. Dr. Hagan stated that plaintiff could not work due to severe pain. Dr. Hagan checked the box "unable to perform" with respect to every job task listed on the form, including "[f]ollow work rules," "[r]elate to co-workers," "[u]se judgment and make decisions" and "[d]irect, control or plan the work of others."

On November 11, 2015, after speaking with plaintiff, United of Omaha extended plaintiff's short-term disability benefits for two more weeks, through November 22, 2015. United of Omaha also requested additional medical records.

United of Omaha received additional records. Among the records were MRI reports from December 2013 and records of a gastric-emptying study done in June 2011. The gastric-emptying study found that plaintiff's stomach empties slowly. The December 2013 MRIs were of plaintiff's cervical and thoracic spine, and they showed degenerative disc disease. At the time, Dr. Hagan did not consider plaintiff a candidate for surgery and, instead, prescribed hydrocodone. On December 9, 2015, United of Omaha received records from plaintiff's November 6, 2015 office visit with Dr. Hagan. At that visit, plaintiff continued to complain of pain.

After it received those additional records, defendant confirmed with plaintiff that no further documents were coming and sent the file to a Nurse Case Manager for review. The Nurse Case Manager was asked whether the restrictions suggested by plaintiff's physician were supported by medical documentation. The Nurse Case Manager responded by saying, among

other things, that she was "unable to determine any restrictions and limitations from the last day worked and forward."

On December 17, 2015, United of Omaha denied plaintiff's application for short-term disability benefits beyond November 22, 2015. In denying additional short-term benefits, United of Omaha stated:

> In summary, the medical documentation provided by Vanessa Hagan, MD covering April 02, 2015 through November 06, 2015, shows that there has been no change in your physical functional capacity which would prevent you from performing the material duties of your regular job. Therefore, no benefits are payable, and your claim has been denied beyond November 22, 2015.

(Administrative Record at 1540).

By June 6, 2016, plaintiff, with the help of an attorney, had appealed the decision to deny her continued short-term disability benefits. In connection with her appeal, plaintiff provided additional medical records, which showed plaintiff had suffered abdominal pain for 24 years, diabetes for 19 years and gastroparesis (which causes poor emptying of food from the stomach) for 8 years. Among the documents were records of plaintiff's visits with Ali Keshavarzian, M.D. ("Dr. Keshavarzian"). In August 2014, Dr. Keshavarzian said plaintiff's "abdominal pain is due to diabetes gut (gastroparesis and possible mononeuritis multiplex) and referred pain from her back." Dr. Keshavarzian noted that plaintiff's pain starts about 20 minutes after eating and lasts for hours, sometimes radiating to her back. The doctor prescribed Linzess (which treats constipation). He also noted that plaintiff had a full range of motion. Plaintiff saw Dr. Keshavarzian again in January 2016 and March 2016. Dr. Keshavarzian again said plaintiff's abdominal pain was due to "diabetic gut with gastroparesis." In March 2016, he noted that plaintiff's constipation had improved with Linzess.

Plaintiff also provided records from plaintiff's visits with Dr. Hirsen, the rheumatologist. Those records showed that plaintiff had first visited Dr. Hirsen in 2010, after she was diagnosed with rheumatoid arthritis. Plaintiff did not return until November 3, 2015, when Dr. Hagen suggested plaintiff see Dr. Hirsen. Dr. Hirsen again diagnosed plaintiff with rheumatoid arthritis and prescribed anti-inflamatory drugs. Dr. Hirsen ordered x-rays, which showed arthropathy in plaintiff's hands and feet. In February 2016, Dr. Hirsen wrote that plaintiff "is unable to tolerate many medications because of chronic gastroparesis. For these reasons, she is unable to sit for long periods because of neck and low back pain, and she is unable to do computer work because of the peripheral joint pain and swelling." In March 2016, as compared to November 2015, plaintiff had fewer swollen joints.

Plaintiff also saw an endocrinologist and a pain specialist. The endocrinologist's records reflected that plaintiff did not complain of pain and that her blood sugar decreased from 343 in February 2015 to 154 in March 2016. Plaintiff's pain specialist noted that in March 2016, plaintiff complained of bilateral wrist, knee and ankle pain, as well as left neck pain and pain that interfered with sleeping. The pain specialist prescribed Cyclobenzaprine for muscle spasms and encouraged plaintiff to continue taking hydrocodone for pain. The pain specialist also administered injections to relieve the pain. When plaintiff returned on April 5, 2016, she reported a 50% reduction in pain.

United of Omaha referred plaintiff's claim for review by an independent specialist, Alan Neuren, M.D. ("Dr. Neuren"). On June 14, 2016, Dr. Neuren provided his report. Dr. Neuren first summarized the medical records he reviewed and noted the restrictions suggested by attending physicians. In his analysis, Dr. Neuren noted, among other things:

> Information indicates insured stopped working due to complaints of chronic pain
> and gastroparesis. . . . At the time her claim was closed in November of 2015,

there were no findings or assessments that would indicate her gastroparesis has worsened or was impairing. With regard to complaints of chronic pain, records indicate insured has been on opiates for ten years. . . . Some facet hypertrophy was noted. These are findings commonly seen in asymptomatic individuals in this age group. . . . When claimant saw Dr. Hirsen on 11/3/15, she had not been seen for five years. He reported diagnosing her with RA due to a positive rheumatoid factor. He ordered a repeat study along with a CCP antibody, but did not provide results of these studies. . . . X-rays of the hand showed osteopenia, but were otherwise normal. There was no evidence of osteoarthritis or rheumatoid arthritis.

(Administrative Record at 1348-1353). In conclusion, Dr. Neuren stated:

Other than complaining of hurting all over when seen on 9/24/15, there are no findings that would indicate there was a change in the claimant's medical condition at the time she stopped working or subsequently. There were no updated imaging studies of the spine. Plain x-rays did not show evidence of significant or impairing disease. Lab data reported by Dr. Hirsen was incomplete. Insured did not comply with recommendations to have a repeat gastric emptying study.

(Administrative Record at 1352-1353).

On June 16, 2016, United of Omaha sent plaintiff a letter, in which it upheld its decision to deny short-term disability benefits after November 22, 2015. Plaintiff filed this suit, claiming short-term disability benefits for the period of November 22, 2015 through December 27, 2015 (at which point long-term disability benefits kick in).

**Plaintiff's claim for long-term disability benefits**

When plaintiff appealed the denial of short-term benefits, she did not include a letter Dr. Hagan wrote on April 28, 2016. (Administrative Record at 1355). She submitted it later (defendant received it June 11, 2016), and it appears that Dr. Neuren did not have the benefit of the letter in his June 14, 2016 review. It appears that the letter was considered in connection with plaintiff's claim for long-term disability. Among other things, in her April 28, 2016 letter, Dr. Hagan wrote:

> I have been [plaintiff's] primary care physician for more than 10 years. . . . In 2010, her overall health started declining. . . . She suffers from chronic pain and fatigue. Congestive heart failure has also made many daily activities difficult leaving her short of breath. She is required to take an increasing amount of pain medications which has affected her ability to focus.

(Administrative Record at 1356). Dr. Hagan summarized plaintiff's health problems and stated:

> [Plaintiff] had expressed concerns about taking her pain medications for joint and back pain because they made it difficult to concentrate. She was also skipping meals when working to avoid taking gabapentin for additional pain from gastroparesis. She is unable to continue working if she takes her medications as prescribed.

(Administrative Record at 1358).

On June 13, 2016, a few days before the STD decision was issued, defendant wrote to plaintiff to inform her that it was beginning its review of her claim for long-term disability. The letter noted that defendant still needed, among other things, to receive the STD decision and to interview plaintiff. On June 16, 2016, one of defendant's Senior Claims Analysts spoke with plaintiff and her attorney. During the call, plaintiff explained that work was physically difficult for her due to the stairs. She also stated that work was difficult cognitively because taking gabapentin made it difficult to focus. Plaintiff noted that she had seen a cardiologist, and the Senior Claims Analyst noted that defendant would wait for those records.

Defendant requested records from Cardiovascular Care Consultants, and defendant received those records on June 27, 2016. Those records reflected that, at a June 6, 2016 appointment, plaintiff had complained of abdominal swelling. Maitrayee Vadali, M.D. ("Dr. Vadali") ordered a Transthoracic Echocardiogram and concluded that plaintiff had diastolic heart failure. Defendant asked Dr. Neuren to review the additional records. Dr. Neuren reported:

> EKG showed a possible anterior infarct of undetermined age. Medications were adjusted. There is no documentation of treatment for these complaints prior or subsequent to closure of her claim over seven months later. Lungs are noted to be

clear. O2 saturation on room air was 95%. More detailed evaluation and testing for reported heart failure was not provided.

(Administrative Record at 0942). Dr. Neuren concluded, "New information does not alter the prior opinion." (Administrative Record at 0942).

Defendant's next step was to order an occupational analysis, based on the job description for plaintiff's position and her employer's statement. On or about July 18, 2016, defendant received the report from Palmer Vocational Services, LLC. The occupational report listed the duties of plaintiff's position and opined that the position was comparable to the position of "Manager, Department" within the Dictionary of Occupational Titles ("DOT"), DOT Code: 189.167–022. The material duties of that position included reviewing and analyzing reports, assigning and delegating responsibility for specific work and resolving problems. The occupational report stated that such a position is sedentary, meaning that it would require frequent sitting, with occasional standing or walking. Such a position also requires visual dexterity and fine finger/hand movements.

On July 20, 2016, defendant wrote a letter to Dr. Hagan. In the letter, defendant stated that it was reviewing plaintiff's claim for long-term disability benefits. Defendant outlined the medical records it had received, including Dr. Hagan's April 28, 2015 letter. Defendant stated:

> Our review found there was no change in Ms. Lacko's condition when she stopped working on September 28, 2015 and subsequently. There were no updated imagining [sic] studies of her spine and plain X-rays did not reveal evidence of significant or impairing disease. The provided documentation has failed to show the basis for any restrictions or limitations that would preclude Ms. Lacko from performing her usual activities, including sedentary work as a Senior Manager on a full-time basis.

(Administrative Record at 0927). In the letter, defendant asked Dr. Hagan whether she agreed with its assessment. Dr. Hagan responded in the negative, noting plaintiff "has multiple medical issues which prevent her from working."

On July 29, 2016, defendant denied plaintiff's claim for long-term benefits.  In the letter explaining the denial, defendant reviewed the medical records it had received and stated, among other things:

> In order to determine disability, we review the medical documentation in file to determine what functional or cognitive impairments are documented and how they would translate into restrictions and limitations.  We review the medical records to determine the maximum work capacity and whether any noted restrictions would prevent an insured person from performing the Material Duties of their Regular Job as noted above.
>
> *  *  *
>
> Based on the information currently in our file, Ms. Lacko ceased working as a Senior Manager . . . on September 28, 2015 due to back pain, gastroparesis and osteoarthritis.
>
> We have received a job description from [plaintiff's employer] for Ms. Lacko's position as a Senior Manager.  This document was referred to our Vocational Rehabilitation Consultant for Occupational Analysis.  Utilizing the Dictionary of Occupational Titles (DOT) the Occupational Analysis found that Ms. Lacko's occupation of Senior Manager most closely relates to the occupation as generally defined in the DOT of Manager, Department (DOT Code: 189.167-022).  The occupation of Manager, Department is performed at the sedentary strength level of work.
>
> *  *  *
>
> The provided medical documentation does not substantiate that she would not be restricted from performing the sedentary duties of her Senior Manager position.
>
> *  *  *
>
> Based on the medical information provided, our review has found there was no change in Ms. Lacko's condition when she stopped working on September 28, 2015 and subsequently.  There were no updated imagining [sic] studies of her spine and plain X-rays did not reveal evidence of significant or impairing disease.  The provided documentation has failed to show the basis for any restrictions or limitations that would preclude Ms. Lacko from performing the Material Duties of her Regular Job as a Senior Manager including exerting up to 10 lbs. occasionally . . . sit[ting] frequently to constantly with intermittent standing/walking and performing near visual acuity and repetitive, bilateral fine finger and hand movements.  Therefore, no benefits are payable and her claim for benefits has been denied.

(Administrative Record at 0902-0910).

By August 4, 2016, plaintiff had appealed defendant's decision to deny her long-term disability benefits.  In connection with her appeal, in January 2017, plaintiff provided defendant

more medical records.  In addition, plaintiff provided defendant with her Social Security claim file.  On July 15, 2016, the Social Security Administration had awarded plaintiff disability benefits.

In connection with plaintiff's application for Social Security disability benefits, the Social Security Administration conducted a mental health assessment on plaintiff in June 2016.  One conclusion from the assessment was that plaintiff had sufficient attention and concentration to persist at and complete work activities for the usual periods of time required in the general work force.  Steven Fritz, Psy.D., concluded that psychological symptoms would not impair plaintiff's capacity to work.  He noted that plaintiff "is oriented and does not have marked memory impairment."  (Administrative Record at 0450).

The Social Security Administration also conducted a residual functional capacity evaluation in June 2016.  It found that plaintiff could do light work, which is to say she could occasionally lift and carry 20 pounds, stand and/or work about six hours during an eight-hour day and sit for six hours of an 8-hour day.  The Social Security Administration concluded that plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were not substantiated by the medical evidence alone.

The Social Security Administration was aware of x-ray evidence of "destructive arthropathy in [plaintiff's] hands and feet" but concluded that plaintiff's limitations from pain, weakness, fatigue and memory issues would not prevent plaintiff from working a light-duty job.  Still, based on plaintiff's age, education level and the fact that her skills would not transfer to other jobs, the Social Security Administration granted benefits based on Grid Rule 202.06, which makes an award mandatory in such circumstances.

In addition to her Social Security records, plaintiff also supplied defendant, in connection with her appeal, additional medical records. Among those records were records indicating that she had seen her pain specialist in May and July 2016. In May 2016, plaintiff told her pain specialist that her pain was reduced 70% with medication, which improved her functionality and quality of life. By July 2016, the improvement was 80%. Still, plaintiff was awakened by pain four or five nights per week. When plaintiff saw her pain specialist in November 2016, the pain specialist recommended physical therapy, which plaintiff tried. At her physical therapy appointment in December 2016, plaintiff reported a sore back and knees.

In August, October and November 2016, plaintiff saw Dr. Keshavarzian again. At the August appointment, plaintiff complained of abdominal pain, nausea and intermittent vomiting. Dr. Keshavarzian concluded that plaintiff's symptoms were due to gastroparesis and diabetes. He recommended Miralax and antibiotics, if plaintiff continued to experience bloating.

Plaintiff also supplied records of cardiology care she had received. Specifically, in August 2016, plaintiff visited Dr. Vadali, who recommended that plaintiff have a neurological examination. In September 2016, plaintiff had a head and neck CT scan. Franco Campanella, D.O. ("Dr. Campanella"), a neurologist, reviewed the CT scan. His notes reflect that plaintiff complained of dizziness and lightheadedness. When plaintiff returned to Dr. Vidali in late November 2016, she was experiencing shortness of breath, edema and vertigo. Concerned that plaintiff might have sleep apnea, Dr. Vadali referred her to Kathia Ortiz-Cantillo, M.D. ("Dr. Ortiz-Cantillo"), a pulmonologist, for, among other things, a sleep study. Plaintiff's reduced lung capacity lead to a chest x-ray (which came back unremarkable) and heart catheterization (which indicated pulmonary hypertension).

Once defendant had received the additional information plaintiff submitted with her appeal, defendant sought a neurology peer review and a cardiology peer review. The neurology review was conducted by Robert Marks, M.D. ("Dr. Marks"), a neurologist. Philip Podrid ("Dr. Podrid"), a cardiologist and Professor of Medicine at the Boston University School of Medicine, conducted the cardiology review.

On February 23, 2017, defendant received Dr. Marks's report. Dr. Marks, who reviewed plaintiff's records but did not examine her, opined that plaintiff's complaints were "not correlated with the objective findings." He concluded that plaintiff could return to work with restrictions. Specifically, Dr. Marks opined that plaintiff would be restricted as follows:

> Sitting would be possible for 5.5 hours during an 8 hour activity day and standing for 2 hours during an 8 hour activity day, and walking for 2 hours during an 8 hour activity day (there should be the possibility of brief breaks to allow for change of posture or position – sit to stand or vice versa) and deep breathing or stretching as necessary, etc; lifting should be possible up to 10 lbs once every 15 minutes; grasping, handling or manipulating objects should be possible on a frequent basis; slight stooping should be possible every 30 minutes; kneeling, crawling and climbing should be avoided.

(Administrative Record at 0202).

On or about February 23, 2017, defendant received Dr. Podrid's report. Dr. Podrid reviewed plaintiff's medical records but did not examine her. Dr. Prodrid opined that plaintiff does not have any objective or subjective findings of heart failure or CAD (coronary artery disease), based on her echocardiograms and the results of her December 2016 heart catheterization, which showed normal cardiac output. Dr. Podrid opined that plaintiff did not have any restrictions based on any cardiac condition. He agreed that she would be limited to sedentary work, due to her pain complaints.

On February 28, 2017, defendant affirmed its decision to deny plaintiff long-term

disability benefits.  In its denial, defendant listed the information it had reviewed and then stated,

among other things:

> In order to determine disability, we review the medical documentation in the file
> to determine what functional or cognitive impairments are documented and how
> they would translate into restrictions and limitations.  We review the records to
> determine whether any noted restrictions would preclude Ms. Lacko from
> performing the duties of her occupation.  We also review each claim to determine
> whether we have complied with all policy provisions.
>
> \*   \*   \*
>
> Our records show Ms. Lacko works as a senior audit manager.  A vocational
> consultant reviewed this job description and found this to be a sedentary demand
> occupation.
>
> \*   \*   \*
>
> Based on the January 30, 2017, letter of appeal Ms. Lacko is claiming disability
> due to chronic pain, fatigue, congestive heart failure, hypertension, osteoarthritis,
> diabetes, asthma, gastroparesis, sleep disturbance, vertigo, vitamin D deficiency
> and anxiety and depression.
>
> \*   \*   \*
>
> Our review of the file finds a long history of complaints of back pain and diffuse
> joint pain complaints.  MRI studies of the lumbar, thoracic and cervical spine on
> December 11, 2013, documented multi-level degenerative changes with disc
> bulging in the lumbar and cervical areas.  X-rays have confirmed arthropathy in
> her hands and feet.  Due to her symptoms of chronic pain Ms. Lacko would be
> restricted to sedentary work activities.  Continued medical treatment for pain
> management should continue.
>
> \*   \*   \*
>
> There would be no restrictions or limitations for obesity or vitamin D deficiency.
>
> \*   \*   \*
>
> Ms. Lacko has been treated for chronic obstructive pulmonary disease and
> asthma.  There is no indication these conditions preclude sedentary work
> activities.
>
> \*   \*   \*
>
> There would be no restrictions for diabetes.
>
> Ms. Lacko has a long history of complaints of abdominal pain, diarrhea,
> constipation, and rectal bleeding.  After extensive testing she has been given the
> diagnosis of chronic gastritis.  She was given a diagnosis of gastroparesis due to
> diabetes.  She has also been treated for bacterial overgrowth in her small
> intestines.  Treatment is with medications.

Ms. Lacko has complained of dizziness and vertigo. Multiple CT and MRI scans have been negative for any acute pathology. There is no evidence of a need for restrictions or limitations due to vertigo or dizziness.

* * *

There is no evidence of impairment from a cardiac condition or hypertension.

Symptoms of anxiety, depression and memory loss have been reported. The records do not note a need for emergency care, an intensive outpatient program, or hospitalization for a mental health diagnosis. There is no indication of . . . cognitive issues or memory impairment to preclude work activities. As part of the Social Security review Ms. Lacko was seen by Dr. Steven Fritz for a mental residual functional capacity assessment on June 24, 2016. This evaluation found no evidence of memory impairment or cognitive impairment.

In order to give full and fair consideration to the appeal we asked for the records reviews by Dr. Podrid and Dr. Marks. These reviews did not find a need for restrictions or limitations to preclude sedentary work activities.

Our review of the file finds that due to multiple medical complaints it is reasonable that Ms. Lacko should be restricted to sedentary work activities. As noted above her position as a senior audit manager is a sedentary strength demand occupation.

We realize that Ms. Lacko has multiple medical complaints and she should continue compliance with prescribed medications and regular visits to her health care providers for management of her symptoms.

In summary, our review of the file does not find evidence of a significant change in the physical or mental functional capacity of Ms. Lacko on or around her last date worked to preclude her from continuing to perform the material duties of her regular occupation. Therefore, we have upheld the prior claim denial and no benefits are payable for this claim.

* * *

We do acknowledge that Ms. Lacko is currently receiving Social Security Disability benefits. However, this does not affect our determination regarding her claim. Eligibility requirements for Social Security Disability may differ from the eligibility requirements under this policy.

(Administrative Record at 0147-0152).

On March 17, 2017, plaintiff filed this suit. She seeks short-term disability benefits from November 22, 2015 through December 27, 2015 and long-term disability benefits thereafter.

## II.      STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."  *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.      DISCUSSION

ERISA § 502 provides a cause of action for participants and beneficiaries of ERISA plans "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).  A district court reviews a "denial of benefits challenged under § 1132(a)(1)(B) . . . under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where, as here, the plan grants such discretionary authority, the Court reviews the denial of benefits under the arbitrary

and capricious standard.  *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017).[3]

Under deferential review, the Court:

> must uphold the decision so 'long as (1) it is possible to offer a reasoned
> explanation, based on the evidence, for a particular outcome, (2) the decision is
> based on a reasonable explanation of relevant plan documents, or (3) the
> administrator has based its decision on a consideration of the relevant factors that
> encompass the important aspects of the problem.'

*Rabinak v. United Bhd. of Carpenters Pens. Fund*, 832 F.3d 750, 753 (7th Cir. 2016) (quoting

*Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)).  Such review, however, is

not a rubber stamp.  *Holmstrom*, 615 F.3d at 766.

In this case, plaintiff challenges two denials of benefits under two separate plans.  The

plaintiff has not tailored her arguments to the separate decisions, but the Court has done its best

to figure out which arguments apply to which decision.

**Defendant's decision to deny short-term benefits**

After plaintiff stopped working on September 25, 2015, she applied for short-term

disability benefits.  Defendant initially granted short-term disability benefits for the period of

October 12, 2015 through October 27, 2015.  On October 27, 2015, defendant extended the

short-term benefits through November 8, 2015.  Defendant later extended short-term benefits

through November 22, 2015.  Ultimately, on December 17, 2015, after having a Nurse Case

Manager review plaintiff's medical records, defendant denied plaintiff's claim for short-term

benefits beyond November 22, 2015.

---

[3]The plans states:  "The Policyholder has delegated to US the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.  Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them."  The parties agree that the arbitrary and capricious standard applies.

When defendant denied benefits beyond November 22, 2015, it did so on the basis that there had been no change in plaintiff's functional capacity that would prevent her from doing her job. Plaintiff appealed, at which point defendant referred plaintiff's claim to an independent physician to review plaintiff's record. That doctor reported that plaintiff had suffered pain and gastroparesis for many years, such that "there are no findings that would indicate there was a change in the claimant's medical condition at the time she stopped working or subsequently." (Administrative Record at 1352-1353). Defendant upheld its decision to deny short-term benefits beyond November 22, 2015.

Plaintiff argues that defendant was arbitrary and capricious when it "did an about-face" (Plaintiff's MSJ Brief at 6) and decided plaintiff had not experienced a "change." Plaintiff also seems to argue that defendant erred by considering whether plaintiff had experienced a change in her condition. The Court does not agree.

To begin with, it was reasonable for defendant to analyze whether plaintiff had experienced a change in medical symptoms, because the plain language of the STD plan requires a change. Specifically, the STD plan says that "**Disability and disabled** mean that because of an Injury or Sickness, *a significant change* in Your mental or physical functional capacity has occurred in which . . . You are . . . prevented from performing the Material Duties of Your Regular Job . . ." (Administrative Record at 1101-1103) (italicized emphasis added). Because the plan itself requires a *change* in mental or physical functional capacity, it was not unreasonable for defendant to consider whether plaintiff had experienced one.

Similarly, defendant was being reasonable when it granted short-term disability benefits through November 22, 2015 and then denied further short-term benefits. When it first awarded short-term benefits, defendant had received medical records from April 2015 that showed

plaintiff had reported feeling pretty good at the time. Defendant also had records from September 24, 2015 that showed plaintiff reported feeling pain all over. That sounds like a change. Later, however, defendant received additional medical records which showed plaintiff had suffered gastroparesis from at least 2011 and degenerative disc disease from at least 2013. In addition, there was evidence in the medical records that plaintiff had taken opiates for pain for a decade. Given that plaintiff's medical conditions were of long duration, it was reasonable for defendant to conclude that plaintiff had not experienced a *change* in functional capacity.

Defendant's decision with respect to short-term disability benefits has a reasonable basis in the facts and in the terms of the plan.

**Defendant's decision to deny long-term benefits**

In connection with plaintiff's claim for long-term disability benefits, defendant took a number of steps. It asked a consultant to analyze plaintiff's job description to determine the comparable position in the Dictionary of Occupational Titles and to assess the functional level of such a position. That occupational analysis concluded that the job was sedentary. Defendant also reviewed plaintiff's file from the Social Security Administration, which concluded that plaintiff could do light work (i.e., work more strenuous than sedentary work). In addition, defendant reviewed all of the medical records plaintiff had supplied and asked two additional doctors to review those records and assess plaintiff's functional capacity. Those doctors concluded that plaintiff could perform sedentary work. Defendant wrote a letter to plaintiff explaining the information it had reviewed and the steps it had taken. In the letter, defendant discussed plaintiff's ailments and its assessment that those ailments limited her to sedentary work. Defendant also explained that the medical records showed that plaintiff had a long history

of ailments rather than a significant change at the time she stopped working.  Defendant denied plaintiff's claim for long-term disability benefits.

Plaintiff argues that defendant's decision to deny her long-term disability benefits was arbitrary and capricious.  Plaintiff first argues that defendant was arbitrary and capricious in its analysis of plaintiff's job duties.  Plaintiff argues that when defendant considered whether she is "prevented from performing at least one of the Material Duties of [her] Regular Job," it failed to consider that she was an auditor who was required to work "long hours" in a job that had "intense cognitive demands" and required driving 25% of the time.  Plaintiff argues that defendant should have considered the duties of her actual position, rather than the duties of a job listed in the Dictionary of Occupational Titles.  The Court disagrees that defendant's decision was arbitrary or capricious.

In making this argument, plaintiff reads only the first part of the definition of disability and ignores the rest of the language of the LTD plan.  The LTD plan says "**Disability and Disabled** means that because of an Injury or Sickness, *a significant change* in Your mental or physical functional capacity has occurred in which you are . . . prevented from performing at least one of the Material Duties of Your Regular Occupation."  (LTD plan at 29-31/Docket [1-1 at 54-57] (italicized emphasis added)).  The LTD plan goes on to define Regular Occupation as not limited to a person's *particular* job.  Specifically, the LTD plan says:

> **Regular Occupation** means the occupation You are routinely performing when Your Disability begins.  *Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT).*  We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice.  *To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are*

*performed for a specific employer*, at a specific location, or in a specific area or region.

(LTD plan at 29-31/Docket [1-1 at 54-57] (italicized emphasis added)).

Thus, given that the plan itself says that defendant will determine job duties based on job descriptions in the Dictionary of Occupational Titles, it was reasonable for defendant to ask a vocational consultant to consider which job description in the DOT was appropriate and then to rely on those duties when analyzing plaintiff's claim, even though the description did not include some of the duties specific to plaintiff's specific job at her specific employer.

Plaintiff also takes issue with the fact that defendant failed to consider the long hours plaintiff had to work as a senior audit manager. The Court does not agree. The plan language states that long hours are not considered a material duty for purposes of the plan. (LTD plan at 29-31/Docket [1-1 at 54-57] ("In no event will We consider working an average of more than 40 hours per week in itself to be part of material duties."). It was not unreasonable for defendant to follow the terms of the plan.

Plaintiff next argues that defendant was arbitrary and capricious when, in determining plaintiff's restrictions, it relied on doctors who had not examined plaintiff instead of relying on plaintiff's own doctors. Plaintiff argues that this was unreasonable "[g]iven the unanimous agreement among [p]laintiff's treating doctors regarding her restrictions." The Court again disagrees.

Plaintiff overstates the agreement among her doctors as to her restrictions. Plaintiff supplied medical records from eight treating physicians, but six of those doctors described only plaintiff's symptoms and diagnoses, without translating those into work restrictions. (This is not a shock: a doctor's job is to diagnose and treat.) Only two of plaintiff's doctors described work restrictions. In October 2015, Dr. Hagan said plaintiff could not work due to "severe" back and

abdominal pain. Dr. Hagan later checked boxes indicating that pain rendered plaintiff "unable to perform" every task on a list, including such basic tasks as following rules, relating to co-workers, making decisions and directing the work of others. Dr. Hagan's assessment that plaintiff could do nothing due to pain was not enlightening. Dr. Hirsen provided more useful but still imprecise information in February 2016 when he stated that plaintiff is unable to sit for long periods of time due to neck and back pain and unable to do computer work due to joint swelling and pain. Dr. Hagan provided additional information about plaintiff's restrictions in April 2016, when she said plaintiff's pain medication makes it difficult for plaintiff to focus, such that plaintiff could not work if she took the medications she was prescribed. Separately and to the contrary, the Social Security Administration concluded that plaintiff was capable of performing light-duty work.

In the face of competing conclusions and imprecise restrictions, it was reasonable for defendant to ask doctors to review plaintiff's medical records and opine on appropriate restrictions. Those reviews did not conclude that plaintiff was unrestricted; rather, those reviews concluded plaintiff was restricted to sedentary work. Defendant adopted that conclusion, a decision which strikes the Court as having a reasonable basis.

Relatedly, plaintiff argues that defendant did not consider her various ailments in combination when considering her restrictions. The Court does not agree. Only two of plaintiff's treating physicians suggested restrictions, so defendant asked two doctors to opine on restrictions, given her ailments. They concluded that plaintiff was restricted to sedentary work. Of course, that is just an assessment of plaintiff's *physical* capability. Plaintiff's physician, Dr. Hagan, when describing the combined effect of plaintiff's many ailments, noted that the medications affected plaintiff's ability to focus. Contrary to plaintiff's argument, however,

23

defendant took that into account. Defendant, in its decision, specifically noted that, in connection with plaintiff's application for Social Security benefits, she had seen Dr. Steven Fritz for a mental residual capacity evaluation. The result of that evaluation was that plaintiff had sufficient concentration and attention to work. Defendant's analysis was reasonable.

Finally, plaintiff argues that the decision was arbitrary and capricious, because defendant failed to give proper consideration to the decision of the Social Security Administration, which granted plaintiff disability benefits. The Court disagrees. To begin with, plaintiff submitted and defendant reviewed plaintiff's Social Security disability file when it considered plaintiff's claim, as evidenced by the fact that defendant mentioned evidence from the Social Security file in its decision. (Administrative Record at 0147-0152).

As plaintiff correctly points out, defendant noted in its decision that the standard for obtaining disability benefits from the Social Security Administration are not the same as the terms of the plan. It was not unreasonable for the defendant to notice the difference. As the Supreme Court has explained:

> In contrast to the obligatory, nationwide Social Security program, '[n]othing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. . . . In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. '[T]he validity of a claim to benefits under an ERISA plan,' on the other hand, 'is likely to turn,' in large part, 'on the interpretation of the terms in the plan at issue.'

*Black & Decker v. Nord*, 538 U.S. 822, 833 (2003) (quoting *Firestone*, 489 U.S. at 115).

In plaintiff's case, the Social Security Administration concluded that plaintiff retained the functional capacity for light duty work, i.e., work more strenuous than sedentary work. Despite its conclusion that plaintiff was functionally capable of light-duty work, the Social Security Administration granted plaintiff disability benefits, because of her age, education and lack of

transferable skills, which made an award mandatory. By contrast, the terms of the long-term disability plan at issue in this case do not require mandatory benefits, based on age and skill. It is not as though defendant ignored the evidence gathered by the Social Security Administration. Defendant reviewed the evidence, was persuaded by some of it (including Dr. Fritz's assessment) and rejected some of it (including the conclusion that plaintiff could do light duty work; defendant concluded plaintiff was more restricted).

In sum, defendant's decision has a reasonable basis in the facts and in the language of the plan. Defendant's decision survives deferential review. Accordingly, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.

## IV.     CONCLUSION

For the reasons set forth above, the Court denies plaintiff's motion [31] for summary judgment and grants defendant's motion [46] for summary judgment. Civil case terminated.


**SO ORDERED.**                                              **ENTERED:**  May 15, 2018


_____
**JORGE L. ALONSO**
**United States District Judge**